UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

*********************************************************************

UNITED STATES OF AMERICA

VS.                          CASE NO.  3:20-cr-484-S

DINESH SAH

*********************************************************************

TRANSCRIPT OF SENTENCING HEARING
HEARD BEFORE THE HONORABLE KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE

JULY 28, 2021

*********************************************************************

APPEARANCES:

FOR THE GOVERNMENT:        Ms. Anna Grazyna Kaminska
                           US Department of Justice
                           Criminal Division, Fraud Section
                           1400 New York Avenue NW
                           Washington , D.C. 20530
                           anna.kaminska@usdoj.gov

                           Ms. Erica Rollins Hilliard
                           US Attorney's Office
                           1100 Commerce Street
                           Suite 300
                           Dallas, Texas 75242
                           erica.hilliard@usdoj.gov

                           Ms. Katherine A. Miller
                           US Attorney's Office
                           1100 Commerce St
                           3rd Floor
                           Dallas, Texas 75242
                           katherine.miller@usdoj.gov

1                    A P P E A R A N C E S
                          (Continued)
2

3    FOR THE DEFENDANT:      Mr. Reed W. Prospere
                             PROSPERE RUSSELL & DEAN
4                            8111 Preston Road
                             Suite 500
5                            Dallas, Texas 75225
                             reedprospere@yahoo.com
6

7    Official Court Reporter:  Thu Bui, CSR, RMR, CRR
                             1100 Commerce Street, #1654
8                            Dallas, Texas 75242
                             (214) 753-2354
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by mechanical stenography,

25   transcript produced via computer.

1                              I N D E X

2                                                          PAGE

3        Appearances...........................          1

4        Proceedings...........................          4

5        Adjournment...........................         47

6        Reporter's Certificate................         48

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>P R O C E E D I N G S</u>

2    (Call to order of the court.)

3    THE COURT:  The Court calls Criminal Action

4    3:20-cr-484-S-1, United States of America versus Dinesh Sah for

5    sentencing and further proceedings.

6    Counsel, please state your appearance and

7    advise whether you are ready to proceed.  On behalf of the

8    Government.

9    MS. KAMINKSA:  Good morning, Your Honor.  Anna

10   Kaminska, Katherine Miller, and Erica Hilliard, and we're ready

11   to proceed.

12   THE COURT:  Okay.

13   MR. PROSPERE:  Reed Prospere for Mr. Sah, and we are

14   also ready, Your Honor.

15   THE COURT:  For the record, Mr. Sah, could you please

16   state your full name.

17   THE DEFENDANT:  It's Dinesh Kumar Sah.

18   THE COURT:  Mr. Sah, you appeared before United States

19   Magistrate Judge Rebecca Rutherford on March 24, 2021, at which

20   time you entered a plea of guilty to Counts 1 and 7 of the

21   Indictment, charging you with Count 1, wire fraud, in violation

22   of 18, U.S.C., Section 1343, and Count 7, engaging in monetary

23   transactions in property derived from specified unlawful

24   activity, in violation of 18, U.S.C., Section 1957.

25   On that date, Judge Rutherford found that your

1    plea of guilty was a knowing and voluntary plea supported by an

2    independent basis in fact containing each of the essential

3    elements of the offense.  You advised her at the time that you

4    understood the elements of the offense, agreed to the accuracy

5    of the Factual Résumé, and admitted that you committed all

6    essential elements of the offenses.  Accordingly, on April 9,

7    2021, this Court accepted your plea and adjudged you guilty of

8    the crimes alleged in the Indictment against you.

9            The Court notes that this Defendant's guilty

10   plea was entered pursuant to a written Factual Résumé, Plea

11   Agreement and Plea Agreement Supplement.  And then as of this

12   morning, an Addendum to Plea Agreement.  And since this was

13   filed today -- this is ECF Document 52.  And all of those

14   documents have been signed by both the Defendant and his

15   attorney.

16           Mr. Prospere, did I get all the documents that

17   relate to the plea agreement?

18           MR. PROSPERE:  As far as I'm concerned, I think you

19   did, Your Honor.

20           THE COURT:  That's it, right, through this morning?

21           MS. KAMINKSA:  Yes, that's right.

22           THE COURT:  All right.  The Court has reviewed the Plea

23   Agreement as well as the other documents that I just

24   referenced, including the one filed this morning, and the

25   charges to which the Defendant has pled guilty and determine

1    that the charges adequately reflect the seriousness of this

2    Defendant's actual offense behavior so that accepting the plea

3    agreement will not undermine the statutory purposes of

4    sentencing or the guidelines, all relevant conduct having been

5    taken into consideration in the calculation of the total

6    offense level; therefore, the plea agreement is accepted and

7    the judgment and sentence will be consistent with it.

8             Mr. Prospere, did you and your client receive

9    in a timely manner a copy of the Presentence Investigation

10    Report filed on June 16, 2021, ECF 41; the Final Presentence

11    Investigation Report, ECF 45, and the Addendum, ECF 46, filed

12    on July 16, 2021?  Did you get those documents?

13             MR. PROSPERE:  Yes, ma'am.

14             THE COURT:  Have you had an opportunity to carefully

15    review the documents with your client?

16             MR. PROSPERE:  Yes, ma'am.

17             THE COURT:  Are you satisfied that your client

18    understands them?

19             MR. PROSPERE:  Judge, we've had some discussion about

20    it, and I've explained to him what my position is on it.  He

21    had some questions about certain aspects of this.  We have

22    discussed those, and we just agree to disagree is about the

23    best way I can say it.

24             THE COURT:  Okay.  But you've gone over the documents

25    with him, he's had an opportunity to ask questions of you, you

1    had the opportunity to answer his questions.  There's areas

2    that you agree to disagree, but you're satisfied that he's had

3    plenty of opportunity to go through these documents and

4    understands them from his perspective?

5            MR. PROSPERE:  Yes, ma'am.

6            THE COURT:  Okay.  Thank you.

7                    Ms. Kaminska, did the Government also timely

8    receive these documents?

9            MS. KAMINKSA:  We did, Your Honor.

10           THE COURT:  And I see no objections on behalf of the

11   Government?

12           MS. KAMINKSA:  That's correct.

13           THE COURT:  Does the Government at this time have a

14   motion relating to the additional level of reduction for

15   acceptance of responsibility?

16           MS. KAMINKSA:  Yes, Your Honor.  At this time the

17   Government would move for the additional one point with respect

18   to Mr. Sah's acceptance of responsibility under the agreement.

19           THE COURT:  Okay.  So that motion is granted.

20                   I only see one set of objections.  And it's

21   really one objection.  And it was filed as Document ECF

22   Number 44 by the Defendant.  It relates to two levels being

23   added under sentencing guidelines 2B1.1(b)(17)(a).  The

24   Government responded to this objection in the Government's

25   Sentencing Memorandum, specifically I believe it was Pages 13

1  through 15, if I have that right.

2          And so the Court has read the objections, the

3  Government's Sentencing Memorandum, and even conducted

4  independent research on this objection.

5          And so at this time since it's your objection,

6  Mr. Prospere, if you want to elaborate any further or stand on

7  the papers, it's up to you.

8          MR. PROSPERE:  Judge, I want to elaborate a little

9  further.

10          THE COURT:  Go ahead.

11          MR. PROSPERE:  And I'm also going to take off my

12  mask --

13          THE COURT:  That's fine.

14          MR. PROSPERE:  -- and inform the Court that I have been

15  vaccinated.

16          The probation department's response, the

17  Addendum to the Presentence Report.

18          THE COURT:  Right.  And I should have mentioned that,

19  too.

20          MR. PROSPERE:  It basically focuses on, and I think

21  correctly so, addressing the harm inflicted on the financial

22  institutions.  And I would point out that my understanding and

23  opinion about this two-level increase is predicated on a harm

24  analysis that's inflicted on the financial institutions.

25  Obviously, if we take the I-30 scandal which occurred 25,

1    30 years ago up to current institutions, a million dollars

2    taken from a mom-and-pop bank in Mexia, Texas or Ozona or

3    Woodson is different than a million dollars that is taken from,

4    for example, one of these, the Bank of America in New York.

5                  And if we're looking at a harm analysis, there

6    is no harm alleged in Paragraph 43 on victim impact.  No people

7    have been laid off, no stability of the financial institutions

8    has been affected about the fact that it's over a million

9    dollars.  And the stability of the institutions itself has not

10   been affected.

11                 It's my feeling that that's why they came up

12   with a million dollars and why they wanted to add a two-level

13   increase if those things happen.  Since those things didn't

14   happen and there's no evidence of the fact in either the

15   probation department's addendum or in the evidence in this

16   case, basically what you're doing is they're getting a double

17   dip with the amount of money that's taken from the institutions

18   without alleging or proving that it has any harmful effect on

19   the institutions itself.  And for those reasons, it is our

20   contention that that two-level increase should not be

21   applicable to this particular case.

22           THE COURT:  Okay.  Let's have a response.

23           MS. KAMINKSA:  Your Honor, we think that the probation

24   officer gave this a comprehensive and accurate treatment.  To

25   begin with, there's nothing in the guidelines that proscribes

1    the --

2         THE COURT:  Okay.  Well, let me just stop you there,

3    okay?  'Cause you're starting out your argument like I thought

4    you would, and let me tell you the difficulty I'm having with

5    probation and your argument.  And you just said it.  There's

6    nothing that prohibits it, therefore we're going to.

7              Have you had -- have you found even one case

8    that analyzes from the Fifth Circuit, really anywhere, that --

9    and, you know, the probation officer is not legal, all

10   right? -- that analyzes this application of this enhancement in

11   this context or anywhere close?  'Cause I haven't been able to

12   find that, and I have some brilliant law clerks that tried to

13   help me and they weren't able to find it.  So...

14        MS. KAMINKSA:  Your Honor, we did --

15        THE COURT:  So that's where I'm -- you know, I get both

16   sides' argument but any enhancement, as with all sentencing

17   enhancement, the Prosecution has the burden of proving the

18   applicability of it, okay, by a preponderance of the evidence,

19   and all I'm hearing from both probation and you is it looks

20   like it applies but there's nothing that prohibits it.  So you

21   got any case whatsoever that helps me with this?

22        MS. KAMINKSA:  Yes, Your Honor.

23        THE COURT:  You do?

24        MS. KAMINKSA:  We cited this in the Sentencing

25   Memorandum.  It's not a Fifth Circuit case.  I wasn't able to

1    find anything in the Fifth Circuit, either.

2             THE COURT:  Okay.

3             MS. KAMINKSA:  But there is First Circuit authority

4    that addresses this issue.  It's not in a PPP case, but it is

5    in a wide-ranging Ponzi scheme.  We cited it in the brief at

6    Page 15.  It's *United States v. Reyes-Rivera.*

7             THE COURT:  What brief?  You're talking about your

8    Sentencing Memorandum?

9             MS. KAMINKSA:  Yes.  Page 15 there.  It's a First

10   Circuit case.

11            THE COURT:  To verify, 'cause I have to go slow here,

12   no Fifth Circuit case on this?

13            MS. KAMINKSA:  That's right.

14            THE COURT:  And the only case you came up with was a

15   First Circuit case in a completely different context, but you

16   are saying, okay, this is not binding but it's analogous, we

17   can make it.  So you want to talk about it?

18            MS. KAMINKSA:  Yes.

19            THE COURT:  Is that where we are?

20            MS. KAMINKSA:  Yes, that's right, Your Honor.

21            THE COURT:  Okay.  Go for it.

22            MS. KAMINKSA:  Of course it's not in a PPP context.

23   This is a -- this is a new area of the law.

24            THE COURT:  And that's one of the reasons I started out

25   and say where else around the country has this been -- has this

1    enhancement been applied?

2         MS. KAMINKSA:  But I think that the Court can take

3    comfort from the fact that --

4         THE COURT:  No, no, no.  I'm asking you a question.

5         MS. KAMINKSA:  There haven't been --

6         THE COURT:  Where else in the country where these PPPs

7    or binding circuit law that says that this is the court, not

8    just -- there's nothing that prohibits the Court but should

9    apply?

10        MS. KAMINKSA:  So I haven't seen it in the PPP context

11   but --

12        THE COURT:  Okay.  I appreciate your honesty.  Okay.

13   Keep going.

14        MS. KAMINKSA:  But considering that some of these are

15   the same charges, wire fraud, bank fraud, that might appear in

16   other kinds of schemes in which this enhancement is addressed,

17   for example, in this First Circuit case.  I'm not sure it makes

18   a difference in that it's not in a PPP context in particular.

19             In this case, there were a number of

20   enhancements for vulnerable victims --

21        THE COURT:  Where's your First Circuit case?

22        MS. KAMINKSA:  This is on Page 15 of the Sentencing

23   Memorandum.

24        THE COURT:  Okay.

25        MS. KAMINKSA:  It's cited there toward the end of the

1    argument.

2           THE COURT:  Yes, I see it.  Do you have a case with

3    you?

4           MS. KAMINKSA:  I do have it.  I do have it with me.

5           THE COURT:  Can you hand it to my law clerk who can

6    then hand it to me, please?

7           MS. KAMINKSA:  Yes.

8           THE COURT:  I'll give it back to you.

9           MS. KAMINKSA:  No.  That's perfectly fine, Your Honor.

10          But that's a case where there were a number of

11   enhancements that arguably had overlapping facts as predicates

12   for the enhancements.  And the court basically held that these

13   factors under the guidelines -- or these -- these enhancements

14   under the guidelines address different purposes.

15          So in this case, you know, I don't think it's

16   double counting in this case because the intended loss that's

17   calculated under one part of the guideline is just that.  It's

18   the intended loss, something that Mr. Sah intended to get based

19   on these fraudulent PPP applications.  The 17 enhancement

20   addresses actual loss and it focuses on a distinct kind of

21   victim, which in this case is loss by a financial institution.

22          And I hear Mr. Prospere with respect to the

23   issue of jeopardizing the safety and soundness of a financial

24   institution, but if Your Honor looks at the enhancement in

25   17(a), it's a disjunctive standard.  And the enhancement

1  applies whether or not there's jeopardy to the financial
2  institution based on the fact that the Defendant derived more
3  than a million dollars in gross receipts from one or more of
4  these financial institutions.
5  Lender 1 in the Indictment, I think in the
6  course of doling out money in response to these fraudulent
7  applications have gross receipts -- or gave gross receipts in
8  excess of something like $11 million, so far more than the one
9  million.  And there's no additional requirement that there was
10  some jeopardy at the financial institution based on the plain
11  text of that guideline.
12  I think that it's not just that there's no
13  limitation in the guidelines, although I think that is a
14  compelling argument.  I think there is positive authority that
15  we cited from the First Circuit that supports this kind of
16  analysis.  And because these are guidelines that address
17  different kinds of aggregating factors, there's no reason why
18  they shouldn't apply because both of those address the totality
19  of the conduct in this case, albeit different parts.
20  THE COURT:  The case that you handed me says quite a
21  bit of what you did, that the defendant "Did [sic] not point to
22  any explicit prohibition against applying these enhancements as
23  double counting and offers no compelling explanation for
24  inferring a prohibition."  And then the Ninth Circuit -- I
25  think that's what it is?  The First Circuit -- yes, the First

1    Circuit in this Ponzi scheme case says, "Sentencing

2    enhancements serve different purposes" -- citing the *Lilly*

3    case -- "and we see no plain error in the court's determination

4    that each of these enhancements applied."

5                 So that's not a lot of authority.

6                 Okay.  Anything further on this, Mr. Prospere?

7          MR. PROSPERE:  No, Your Honor.  I'd be interested in

8    knowing the research that was done by the probation department

9    who keeps focusing on because the specific offense

10   characteristics addresses the harm inflicted on financial

11   institution.  Again, I keep coming back to that's -- there's no

12   other reason for having a figure, whether it's 800,000, a

13   million or 2.5 million.  It's -- to me, it's designed to

14   address is there a harm inflicted on a financial institution,

15   and I don't see it here; therefore, I don't think it's

16   applicable.

17         THE COURT:  And the probation officer who's here today

18   was not the one who prepared the report -- or the Addendum that

19   address these objections.

20                 Let's go off the record.

21                     (Off the record.)

22         THE COURT:  Back on the record.

23                 Off the record I confirmed on Page 2 of the

24   Defendant's Objections to Presentence Report, ECF 44.

25                 Mr. Prospere, at bottom, you're saying that

1   with the three levels acceptance, if your objection is

2   sustained, the punishment range would be -- total offense level

3   would be 31 with a range of 108 to 135 months.  Is that still

4   accurate?

5           MR. PROSPERE:  Yes, ma'am.

6           THE COURT:  Okay.  Government, same question to you.

7   If I sustain the objection, would that -- do you agree that the

8   total offense level would be 31 with a range of 108 to 135?

9           MS. KAMINKSA:  Yes, Your Honor.

10           THE COURT:  Probation, you agree, too?

11           PROBATION OFFICER:  Yes, Your Honor.

12           THE COURT:  We're all on the same page.  All right.

13               Because -- I think you both make very

14   interesting arguments, and the Court does not have Fifth

15   Circuit precedent to weigh in on this.  Because the Prosecution

16   has the burden of proving the applicability of the sentencing

17   enhancement by a preponderance of the evidence -- that's under

18   *Scott*, Fifth Circuit case -- the Court right now is

19   uncomfortable with really having no precedent.  I can see that

20   it could be applicable, I really do, but I would like this to

21   go up only once.  I don't think the Government will take it up

22   on this issue.  So I'm going to sustain the objection because

23   of the burden and the lack of comfort I have in applying this.

24               So any other objections, Mr. Prospere?

25           MR. PROSPERE:  No, Your Honor.

1    THE COURT:  All right.  And, again, any objections by

2    the Government?  We're done, right?

3    MS. KAMINKSA:  That's correct, Your Honor.

4    THE COURT:  There being no further objections, the

5    Court adopts as its final findings of fact the statement and

6    guideline applications in the Final Presentence Report, subject

7    to and including any changes and qualifications made by the

8    Addendum and any findings made by the Court today.

9    We went over this but I just want to say it

10   officially, that the guideline range is now:  Total Offense

11   Level 31; Criminal History Category 1; imprisonment range,

12   one -- on Count 1 will be 108 to 135 months, Count 7 will be

13   108 to 120 months, and those will be concurrent; and supervised

14   release range, one to three years; fine range will be 30,000 to

15   $10 million.

16   Sound right, according to the Government?

17   MS. KAMINKSA:  That's correct, Your Honor.

18   THE COURT:  Counsel?

19   MR. PROSPERE:  Judge, I thought I heard you say the

20   sentencing range was 108 to 120?

21   THE COURT:  No.  For Count 1 it's 108 to 135, for

22   Count 7 it's 108 to 120.  I separated them out because I'm

23   going to be sentencing them separately.  You agree?

24   MR. PROSPERE:  Yes.

25   THE COURT:  Okay.  I don't believe there are any

1    motions, but there has been the Government's Sentencing

2    Memorandum which laid out the 3553(a) factors, you know,

3    arguing for 135 months.  And so I don't really see any motions.

4                     Are there any motions at this time, on behalf

5    of the Government?

6                     MS. KAMINKSA:  No, Your Honor.

7                     THE COURT:  On behalf of the Defendant?

8                     MR. PROSPERE:  No, Your Honor.

9                     THE COURT:  All right.  Then at this time I'm going to

10   turn to the Defendant.

11                     Mr. Prospere, if you wish to make any remarks

12   on behalf of your client or present any witnesses.  And,

13   obviously, Mr. Sah has the right to allocute.  The order of all

14   that will be up to you, and I'm going to turn it over to you

15   right now.

16                     MR. PROSPERE:  Thank you, Judge.

17                     THE COURT:  Sure.

18                     MR. PROSPERE:  I believe Mr. Sah has some matters that

19   he would like to address with the Court, and then I have a few

20   final remarks I'd like to make after he speaks.

21                     THE COURT:  Thank you, sir.

22                     Mr. Sah, the law allows you to speak on your

23   own behalf or present any information in mitigation of your

24   sentence.  If you wish to do so, now is the time.  You can go

25   ahead, if you want to.

1          THE DEFENDANT:  Thank you, ma'am.  And I am fully

2    vaccinated, so if you would allow me, I would like to...

3          THE COURT:  My rule is you can drop your mask as long

4    as people within six feet of you have no problem with it, and I

5    don't think your counsel --

6          THE DEFENDANT:  If you can hear me like this, ma'am,

7    I'm okay.

8          THE COURT:  Okay.  Whatever you want to do.

9          THE DEFENDANT:  First, I like to tell the Court that I

10   understand and realize that they are big mistakes, and I fully

11   accept responsibility for my actions.

12         THE COURT:  You know, I think you should drop your mask

13   'cause I'm still having trouble hearing you, sir.  I'm sorry.

14   Thank you.

15         THE DEFENDANT:  Thank you, ma'am.

16         And I like to say one thing, that the

17   Prosecution has been specifying and saying that I have caused a

18   loss, I have caused a loss, I have caused a loss.  Yes, there

19   is an intended loss and it is -- I agree with them there was,

20   but the Government has confiscated all of my assets.  And if

21   you look at the sentencing guidelines, the amount of recovery

22   is more than the amount of total intended loss.  So -- but I

23   thank you, ma'am, for granting the motion and sustaining the

24   objection.  And I like to continue over here.

25         First, I want to apologize to this Court, my

1   family and my friends and to the community at large.  Since my

2   arrest last September, my family and I have been in a lot of

3   grief.  Grief has five stages -- denial, anger, bargaining,

4   depression, and acceptance.  I've gone through all and accept

5   that my actions are...(weeping).  They have taken a toll on my

6   family, my friends.

7           Every day I have been tormented the most.  And

8   I prayed for months for my sentence.  I have confessed and

9   prayed.  Because I'm with God, I modified myself for

10  centeredness and repented.  I have sought spiritual redemption

11  from the chaplains and the community and from fellowship

12  groups.  The chaplains have told me that my -- all the prayers

13  have been heard and that I have been forgiven by Lord Almighty.

14  But I believe I'm also responsible for the position toward this

15  Court that I have wronged the society at large, which is why we

16  are here today, ma'am.

17          Along with my acceptance of my harmful actions,

18  I'm also ready for accepting the consequences, which hopefully

19  will be just consequences with respect to my time in prison.  I

20  seek mercy and blessings from you and this Court and ask you to

21  guide me on my time in prison.  I will use this time to improve

22  myself so that when I leave, I will be informed and a better

23  person and an example to others like me.

24          Thank you, Your Honor.

25          THE COURT:  Thank you, sir.

1          There's a box of Kleenex.

2          Mr. Prospere, go ahead.

3      MR. PROSPERE:  Judge, my remarks will be brief.

4          I would just point out to the Court that, on

5  Mr. Sah's behalf, he timely accepted responsibility for his

6  actions when confronted by the agents and the Government and

7  the first opportunity I had to deal with him and entered a plea

8  and has been -- the Presentence Report reflects cooperative

9  with the Government throughout this journey in terms of signing

10  over property, signing over money.

11          And I would just like the Court to consider the

12  fact that at age 56 or 57, the sentencing range from basically

13  9 to 11 years in this case is a more harsh sentence for

14  somebody his age than it would be for somebody at age 35 that

15  have committed the same offense because he has less life

16  expectancy from this point on than -- than a 35-year-old.

17          I can anticipate some of the arguments that the

18  Government has made; don't necessarily disagree with all of

19  them.  And would hope the Court would see this as a, at worse,

20  middle of the guideline sentencing case as opposed to the

21  maximum and would ask the Court to do that.

22          Thank you.

23      THE COURT:  Does that conclude what you would like to

24  present to the Court on behalf of your client?

25      MR. PROSPERE:  Yes, Your Honor.

1          THE COURT:  Thank you.

2               Does the Government wish to be heard?

3          MS. KAMINSKA:  Yes, Your Honor.

4          THE COURT:  Go ahead.

5          MS. KAMINKSA:  Your Honor, as the Government outlined

6     in its papers, Mr. Sah engaged in a fraudulent scheme in which

7     he stole vital funds that were intended to help small,

8     struggling, legitimate businesses during a global pandemic.  A

9     scheme that I think can only be characterized as brazen.

10               As the Court is aware, the Paycheck Protection

11    Program, or PPE, funds in question were part of a significant

12    legislative effort to help stem the negative impact to small

13    businesses amid a steep economic turn -- downturn.  And they

14    were authorized as forgivable loans to these legitimate

15    businesses who needed them to pay employees through payroll and

16    do things like pay leases on buildings to remain operational

17    and accompanying utilities.  And so lenders across the nation

18    participated in this program and doled out money really as

19    quickly as possible to try to provide relief under what was

20    then trying in uncertain circumstances.

21               And Mr. Sah, as the investigation revealed,

22    seized on this unique opportunity to make a lot of money and

23    repeatedly lied in PPP applications to get this money.  The

24    supposed businesses that he used in connection with the scheme

25    were sham vehicles that weren't operational or eligible.

1    Basically, many of them are made up.

2                    He forged bank account statements repeatedly to

3    make it look like these vehicles for fraud had legitimate and

4    eligible expenses.  He repeatedly fabricated IRS filings to

5    make it look like these businesses paid payroll.  He lied about

6    the employees that he had.  And worse, in some of these

7    applications, he actually listed employee names that, based on

8    further investigation through the Social Security

9    Administration and other records, had zero connection to

10   Mr. Sah, his associate, or his businesses.  He basically

11   misappropriated these people's likeness for his own gain.

12                   And in a similar vain, in order to distance

13   himself from the fraud, at some point he started using other

14   people's identities in order to perpetrate the fraud without

15   these people's knowledge or consent, and that's because he

16   didn't want the repeated approvals by the lenders for more and

17   more money to attract any scrutiny.

18                   Your Honor, these actions were very deliberate.

19   They were very well hatched, and they were successful on a very

20   large scale.  In a span of approximately four months, Mr. Sah

21   fraudulently obtained over 17 million in COVID-relief funds.

22   And he never intended to spend the money on payroll.  It's not

23   as though he got this money and part of it he spent on himself

24   and part of it he spent on legitimate businesses.  He took them

25   all.  And he spent the money to fund a lavish lifestyle that

1    included multiple homes, luxury cars, personal investments of

2    his own liking, and wires overseas in millions, in millions

3    abroad.

4              And so I think it's important not to forget

5    that this was last year at a time when the nation was in the

6    throes of a global pandemic.  And so when other businesses were

7    struggling to pay their employees so they could keep food on

8    the table, Mr. Sah was taking these COVID-relief funds and

9    going and buying a brand-new Bentley convertible.  Without a

10   doubt, Mr. Sah was dogged in his fraud.

11             Bank records show that once he got traction

12   with a few of the fraudulent applications, he actually planned

13   to retire with the relief funds, put his feet up.  There were

14   online banking records that show that in May of 2020 he created

15   a folder in one of his personal accounts called To be Retired,

16   May 2020, which coincided exactly with the onset of his fraud.

17             And on a recorded call with a representative of

18   Company 2 in the Indictment, once he had success with several

19   of these applications, he asked the representative, "Well, how

20   much more is left in the PPP program?"  And when the

21   representative told him about $80 billion, Mr. Sah then filed

22   seven more fraudulent applications for this money.

23             And at some point, as we outlined in our

24   memorandum, there were so many businesses, supposed addresses,

25   fake bank accounts, and so many applications that he began

1    making mistakes.  And so for instance, he'd apply under the

2    name of one business and describe it as being involved in a

3    particular industry, and then to another lender use the exact

4    same business name but describe it as a totally different

5    industry.  Or with one lender, he would propose a payroll

6    number, a number of employees for one business, and with a

7    different lender use those exact same numbers for a number of

8    employees and payroll for a totally different business.  An

9    unlikely coincidence.

10              And so at the end of the day, the only thing

11   that was consistent among all of these applications was that

12   the information that Mr. Sah was providing was consistently

13   false.  And he, in fact, began keeping a spreadsheet of the

14   fraud just to keep track of the lies that included all of the

15   borrowers, the payroll numbers, the fake e-mail addresses, et

16   cetera, that became a playbook of the fraud that agents

17   discovered upon a search of his home.

18              Your Honor, these are circumstances in which a

19   serious sentence is warranted, and that's reflected in the

20   guideline range of 108 to 135 months.  It is, of course, a

21   positive that Mr. Sah accepted the guilty plea and

22   responsibility and admitted to the conduct after the

23   Government, of course, surfaced, and that's why the Government

24   submits that a sentence within this range would be appropriate.

25   But the crimes for which there's this substantial of payload

1   require a substantial deterrence.

2                This case really is the result of an

3   extraordinary effort by law enforcement, in particular IRS and

4   FDIC OIG, which -- who have spent months of time and effort

5   just unpacking the layers of the fraud.  I think the months of

6   time and work are a reflection of the fact that Mr. Sah's

7   disbursements of these funds were so wide and of such a

8   magnitude that it's taken a long time to trace and try to

9   recoup some of these funds.  We have managed to recoup several

10  million of them, but some of these are incredibly hard to trace

11  because they were parked in vehicles, homes, wires to India in

12  millions of dollars, and so I think to this day some of those

13  funds are going to remain untraceable.

14               And the collateral damage, finally I'll

15  mention, was pretty substantial in this case.  In stealing

16  people's identities, Mr. Sah upended these people's lives.  He

17  took advantage of his wife behind her back, taking her identity

18  and applying, in two cases, for a loan.  And Your Honor

19  probably saw in the PSR that was already a troubled

20  relationship.  He lied to his ex-romantic partner, promising to

21  help her with a tax refund and using her driver's license in

22  the application.  He lied to his business associate, took his

23  tax filings, promising to open a joint account for their

24  alleged business.  And he lied to his friend, saying that he

25  needed his driver's license to help him get employment during

1    the pandemic all only to then file fraudulent PPP applications

2    using these people's likeness.  And, of course, this is all

3    before trying to leave the country on a one-way ticket to India

4    on the day of his arrest.

5                    We're not out of the woods yet with the

6    pandemic.  There's no telling what's going to happen with the

7    virus and, really, funds in the future.  And the Government

8    would submit that whatever sentence the Court hands down serve

9    as a stern and important warning for would-be fraudsters who

10   engage in this kind of conduct, which is unacceptable, and know

11   that they'll be brought to justice.  Relief funds and people

12   shouldn't be abused in this manner.  And so given Mr. Sah's

13   brazen efforts to lie, cheat, and steal COVID-relief funds, and

14   for all of the reasons set forth in the Government's Sentencing

15   Memorandum, the Government submits that a sentence of

16   135 months is appropriate in this case.

17                    Thank you.

18           THE COURT:  Thank you.

19                    Anything further on behalf of the Government?

20           MS. KAMINKSA:  No, Your Honor.

21           THE COURT:  Defense?

22           MR. PROSPERE:  No, ma'am.

23           THE COURT:  Okay.  Before I pronounce the sentence,

24   there are some things that I think I need to get on the record

25   and clear it up.

1          I'd like to go to the Government's Sentencing

2    Memorandum and the amount of restitution, which is not objected

3    to.  It's 17,284,649.79.  $17,284,649.79.

4          There was a flurry of filings this week that

5    related to -- I'll tell you exactly what it related to.  It's

6    hard for me to keep up.  There was an unopposed motion for

7    preliminary order of forfeiture that was filed two days ago.

8    The Court -- I think it's better if I just read it from my

9    docket sheet -- granted that unopposed motion on the same day.

10   Then ECF 52 and all of the following were -- today, there was

11   an Addendum to the Plea Agreement -- I referenced it before --

12   signed by the Defendant and his lawyer, and then a Preliminary

13   Order of Forfeiture that I signed today based on documents I

14   saw; that's ECF Number 53.

15         And, you know, there, also, previously filed

16   were motions and notices relating to a sale and a bill of

17   particulars and all that.  Okay?  It was -- it was rather

18   difficult to keep up and make sure, but I would like to make it

19   very clear on the record.

20         Mr. Prospere, listen up here.

21         So what the Court gleans from this, is there's

22   an attempt to recapture some of the loss, right?  So if the

23   Government -- since I think you took the lead in most of these

24   documents -- can walk the Court on what happened and make sure

25   the Is are dotted and the Ts are crossed and whether the --

1    ultimately, whether it affects the total amount of restitution.

2    Has it already been recaptured?  Does the restitution go down?

3    How -- I'll be honest with you, I haven't seen something like

4    this, especially everything that was filed in the last -- well,

5    a few hours, actually.  So walk through it in a way that's

6    clear on the record and the Court can understand and whether or

7    not, ultimately, it affects the amount of restitution.  Go

8    ahead.

9         MS. HILLIARD:  Yes, Your Honor.  I am going to begin

10   with the impact on the restitution.

11            First, the United States is seeking both the

12   restitution amount in full, that is the $17,284,649.79, and

13   that is in addition to the forfeiture.  Longstanding

14   precedent -- longstanding, both national and Fifth Circuit

15   precedent for which I do not have with me today, Your Honor --

16        THE COURT:  No, I'm not disputing it.  But I just want

17   to ask if that's the number that still is applicable today even

18   if you recaptured some of the dollars, or it's in the works.

19        MS. HILLIARD:  Yes, Your Honor.  And that's just the

20   basic principles of forfeiture versus restitution.  Forfeiture,

21   by statute and design, is designed to -- to reflect the harm --

22   the gain that a defendant derives from criminal activity while

23   restitution is designed to reflect the harm to the victim.  And

24   so they're two separate figures.

25            With regard to the forfeiture, yes, I

1    understand that it was difficult to follow, and that is just a

2    reflection of the massive amount of --

3          THE COURT:  And the fact that you did it at the last

4    minute, okay?

5          MS. HILLIARD:  Yes, Your Honor.

6               So just -- just for the record, Your Honor, we

7    worked on this forfeiture for -- since prior to his criminal

8    complaint.  It has required an extensive amount of work.  Over

9    70 different seizures.  Some of the reasons why we're still

10   working on it and we're still adding other documents is because

11   we're still uncovering layers and layers of the fraud --

12         THE COURT:  Okay.  I'm not faulting that this took a

13   massive effort.  I see 1, 2, 3, 4, 5 -- maybe six agents here

14   that probably helped you on this.  But is that the right

15   amount --

16         MS. HILLIARD:  Yes, Your Honor.

17         THE COURT:  -- as of today despite all these -- and

18   walk me through the documents that you filed and tell me the

19   affect, if any, on sentencing today.

20         MS. HILLIARD:  Yes, Your Honor.

21              With regard to the forfeiture, we started off

22   the forfeiture -- and, Your Honor, are you only referring to

23   the sentencing -- the documents mentioned in the sentencing, or

24   are you referring to all the different filings and motions

25   and --

1    THE COURT:  I would like you to chronologically take me

2    through all the filings and motions with respect to money

3    amounts, whether it's forfeiture or restitution, and make sure

4    it's clear on the record what you did, even though it was done

5    in a very hurried manner because we had set the sentencing as

6    of today.

7         MS. HILLIARD:  Yes, Your Honor.

8              I am going to start with the Plea Agreement.

9    So in the Plea Agreement at that time, all of the properties at

10   Document 30 that we had forfeited at that point are all listed

11   independently, and those are also the properties that were

12   included in the Indictment in addition to additional properties

13   and different types of assets that the United States discovered

14   after the Indictment.  And so all of those properties are

15   outlined in Document 30.

16             Those properties are all forfeited properties.

17   Through the forfeiture property -- through the forfeiture

18   process, that money would ultimately go to MLARS.  And there is

19   a process with MLARS whereby we may be able to secure those

20   funds to cover some of the restitution, Your Honor; however,

21   the United States -- like as the assistant United States

22   attorneys, we do not have the ability to make any type of

23   recommendation.  Basically, MLARS operates by their own

24   regulations.

25             And if this case meets the regulations -- and I

1    can't say on the record because I'm not allowed to, that we

2    would definitely have those funds restored.  But this is the

3    type of case wherein the funds that we recovered from those

4    forfeited properties in Document 30 could be applied to the

5    restitution amount, thereby reducing the restitution.

6              After that, we filed the -- we filed a

7    Document 42, the Bill of Particulars.  That Bill of Particulars

8    included additional assets that we were able to discover with

9    regard to Mr. Sah's fraud.  Those assets were discovered and

10   uncovered after the Plea Agreement was signed.  Mr. Sah did

11   agree to that Bill of Particulars.  And, again, those are funds

12   that would be subject to a similar MLARS process; however, at

13   this time, they have no impact on the actual order of

14   restitution.

15             We further filed a Document 39, a Joint Motion

16   for an Interlocutory Sale of Personal and Real Property.  That

17   is -- those were some of the same properties that were listed

18   in the Plea Agreement.  What was happening in that case, Your

19   Honor, is we needed to go ahead and sell those properties and

20   not await the final order of forfeiture.  And the reason is, is

21   because the properties were dissipating in value in addition to

22   the fact that the homeowners' association, including the

23   attorneys for the county, started seeking out the United States

24   and our agents basically requiring us to move on the property

25   and improve the property, something that we could not have done

1   without Mr. Sah's consent and without this Court ordering the

2   interlocutory sale.  So it doesn't have -- it doesn't impact

3   the value.  It's repetition of property.

4        THE COURT:  Okay.

5        MS. HILLIARD:  And then on today, we filed the

6   additional addenda to the -- to the Plea Agreement for

7   additional properties and assets that the United States

8   discovered and are seeking to secure that preliminary order of

9   forfeiture and ultimately a final order of forfeiture from this

10  Court.  Again, those are properties, additional assets that we

11  were able to uncover in the totality of this scheme and assets

12  that we are still tracing down.

13            And just so Your Honor knows, there is still

14  additional assets out there that we are still trying to go

15  through all the different layers of fraud, and so there may

16  be -- and we anticipate that there will be additional filings

17  on the record in addition to all the pending third-party

18  petitions that we expect to litigate after this Court issues a

19  final order of forfeiture to the properties.

20            However, at the conclusion of that, none of

21  those documents and -- and any of those forfeitures and any of

22  the agreements between the parties impact the total amount of

23  restitution to be ordered by this Court.  There's a process by

24  which the -- if MLARS approve for those funds to be sent back

25  to apply to the restitution order, then at that time that

1    amount would be there -- reduced by that -- the amount that

2    goes towards that -- towards the restoration or restitution, if

3    any.

4                    Is that clear, Your Honor?

5             THE COURT:  As clear as you put it on the record.

6                    All right.  So bottom line is restitution

7    amount is 17,284,649.79.  You feel that all the Is have been

8    dotted and Ts have been crossed with respect to what you need

9    from the Court and from the Defendant to get us to this point;

10   that things are not complete yet, but the Court's not going to

11   worry about what's not done at this point.

12                    Did I summarize that accurately?

13            MS. HILLIARD:  Yes, Your Honor.

14            THE COURT:  Okay.  Mr. Prospere, I saw you taking notes

15   and listening carefully.  Are you in agreement that we're at

16   17,284,649.79?

17            MR. PROSPERE:  I guess I have a few questions, Judge.

18   First of all, is the 17,284,000 and change figure the amount

19   that they think Mr. Sah obtained as a result of his fraudulent

20   actions?

21            MS. HILLIARD:  That is the exact amount that we know he

22   obtained as a result of his fraudulent actions.

23            MR. PROSPERE:  Is there an exact figure of monies that

24   have been recovered up to this point in time, from freezing

25   certain bank accounts, that they detailed in several pages that

1    are contained in the Presentence Report as well as through

2    other sources?  Is there an amount of cash that has been

3    obtained as a result of your efforts to reimburse the

4    Government?

5         MS. HILLIARD:  Yes, Your Honor.  There is an exact

6    dollar number.  That number is ever-changing.  It's at,

7    roughly, $10.1 million right now, in addition to the properties

8    that have not sold.  The outstanding amount that we are not

9    certain that we will be able to cover -- recover but possibly

10   may will be about $6.1 million.

11        MR. PROSPERE:  Okay.  I took Mickey Mouse math, so this

12   is difficult for me to follow.  Y'all have recovered in excess

13   of $10 million in property and cash?

14        MS. HILLIARD:  In cash.

15        MR. PROSPERE:  In cash?

16        MS. HILLIARD:  Yes.  And there are --

17        MR. PROSPERE:  There's seven million and change that is

18   still out there that a percentage of which you anticipate will

19   be able to be recovered, and so that amount will be applied to

20   restitution that is owed so that his figure is going to be

21   somewhere in the...

22        THE COURT:  Going down.

23        MR. PROSPERE:  Going down to the $7 million range.

24        THE COURT:  Right?

25        MS. HILLIARD:  No.  First, that $7 million range, we

1   may be able to recover those funds.  What we know for a fact is

2   many of them have been gone.

3       THE COURT:  Well, wait a minute.  He's not trying to

4   argue with you.  He's just trying to say if you recover the

5   funds and you get this cash, will this number go down, and the

6   answer if you get it?

7       MS. HILLIARD:  The answer is the United States cannot

8   tell that because that is a process that's done by MLARS, and

9   MLARS has to follow their regulation to determine whether or

10  not it will apply to the forfeiture.

11      THE COURT:  Okay.  So they follow their process and

12  they -- all gets applied correctly, this number goes down,

13  right?

14      MS. HILLIARD:  If they follow their process and their

15  process determines that it should be applied, it will go down.

16  Yes, Your Honor.

17      THE COURT:  Okay.  So whatever's recovered and the

18  process go through, it's going to affect the bottom line of

19  what the Court orders is restitution, right?

20      MS. HILLIARD:  Yes, Your Honor.

21      THE COURT:  All right.

22      MS. HILLIARD:  I just want to be very clear --

23      THE COURT:  Well, hold on.  You're just trying -- we're

24  just trying to -- I think the Defense and I are trying to ask

25  the same question is, if these monies are recovered that you

1    filed all -- I'm talking to you.

2          MS. HILLIARD:  Yes, Your Honor.

3          THE COURT:  -- that you filed all these last-minute

4    documents on, that we're trying to find out, the restitution

5    amount goes down, assuming that it's collected and the process

6    and law is complied with and -- it'll go down, right?

7          MS. HILLIARD:  Yes, Your Honor.

8          THE COURT:  And doesn't -- and that hasn't happened

9    yet, so it's not affecting the amount right now?

10         MS. HILLIARD:  Yes, Your Honor.

11         THE COURT:  Okay.  Did your questions get answered?

12         MR. PROSPERE:  I guess my question would be, what -- I

13   mean, I'm getting from this that it's impossible for them to

14   determine an exact amount to give to you to put in a document

15   that they can feel comfortable with, and I get why that is.

16   But I don't understand necessarily -- are they asking you to

17   make a finding that he owes 17,284,000 when they know that over

18   10 million has been recovered of that?  And my position would

19   be that he -- if they know they've got 10 million, then the

20   restitution figure should be just 7 million and change, not

21   17 million and change.

22         THE COURT:  Correct me if I'm wrong.  I think the total

23   restitution amount, which you're not contesting, is

24   17,284,649.79 as the base level.

25         MR. PROSPERE:  As the base level.

1    THE COURT:  And then as far as amount's collected --

2    and I've got to put a number as the total amount of

3    restitution, the process goes in place to apply it to the

4    restitution, and that's out of the Court's hands right now.

5    And that's -- but none, as of today, reduces that amount.

6    MS. HILLIARD:  Yes, Your Honor.  The Mandatory Victims

7    Restitution Act requires that this Court shall order

8    restitution in the full amount of the victim's loss.

9    THE COURT:  Right.  Right.

10   MS. HILLIARD:  Everything else we were discussing is

11   secondary to the full amount of the loss --

12   THE COURT:  And to --

13   MS. HILLIARD:  -- that shall be ordered.

14   THE COURT:  And to use -- an example that is easier to

15   understand is if the Court orders restitution and -- it's not

16   as complicated as this -- they have accounts just generally

17   that can apply to restitution, they -- they get lawsuit money,

18   they get income, they get all that, prisoner account money, all

19   that stuff, that goes -- gets applied to restitution and then

20   the process starts lowering that?

21   MS. HILLIARD:  Yes, Your Honor.

22   THE COURT:  Okay.  That's all.

23   Are we good?

24   MR. PROSPERE:  We're good.

25   THE COURT:  All right.  All right.  And the

1   supplemental plea agreement and the Addendum to the Plea

2   Agreement, the Addendum that was filed today -- am I

3   paraphrasing right? -- adds more specific items that weren't in

4   the original list?

5          MS. HILLIARD:  Yes, Your Honor.

6          THE COURT:  And, Mr. Prospere, you went over that

7   document with your client, right?

8          MR. PROSPERE:  Yes.

9          THE COURT:  And you signed it?

10         MR. PROSPERE:  Yes.

11         THE COURT:  And the Defendant signed it?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And that was of your own free will, without

14  any pressure.  You understand that document.  You had an

15  opportunity to go over that with your lawyer as well, right?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  Okay.  Do you have any questions about that

18  document?

19         THE DEFENDANT:  No, ma'am.

20         THE COURT:  At all?

21         THE DEFENDANT:  At all.

22         THE COURT:  Okay.  Okay.  Anything further before I

23  pronounce the sentence?

24         MS. HILLIARD:  No, Your Honor.

25         MR. PROSPERE:  No, Your Honor.

1          THE COURT:  Thank you.

2              I heard what the -- both parties have said,

3     both the Defendant and the Government, and the offenses

4     described in the Indictment and in the Government's papers.

5     The Court finds that the repeated conduct exercised by the

6     Defendant in this fraudulent scheme to be of such an extreme

7     and outrageous nature.  Particularly during the pandemic, it's

8     even hard to fathom.

9              There's a web of fraud and lies, one on top of

10    the other, that took advantage of so many people.  And it took

11    a lot of forethought and a lot of thinking and a lot of smarts

12    applied to this to make this happen.  It's at a level that the

13    Court is incredulous.  It's not a one-time mistake.  It's not a

14    two-time mistake.  It's not a five-time mistake.  It's a

15    multiple-time mistake.

16             And although the guideline range is, because

17    the sustaining the objection, 108 to 135 months and the

18    Defendant's criminal history is a Category 1 -- the Court also

19    has looked through the Defendant's criminal history, and -- and

20    there is criminal history.  They just don't -- they're not

21    added into points, into the total offense level.

22             And so with a Criminal History 1, the Court

23    would tend to want to be sentencing at the lower end of the

24    guideline.  And it was a tough decision as to whether or not to

25    grant -- sustain the objection.  But irrespective of where the

1    objection ended up, overruling or sustaining -- or denied and

2    sustaining, I -- I find that the Court is in agreement with the

3    Government's request of 135 months.  And, quite frankly, in

4    light of this case with this Defendant and the extreme conduct

5    that was exhibited here with deliberation, that may be on the

6    light side of what this deserves.  But since the Government has

7    requested it, and the Court is not in the habit of doing upward

8    departures, although this case could have deserved an upward

9    departure, I will stay within the guidelines.  But I'm going to

10   tell you, it was a tough one for me, reading all that I read

11   about what occurred.

12              So it is the judgment of the Court that the

13   Defendant Dinesh Sah in 3:20-cr-484-S-1 is hereby committed to

14   the custody of the Federal Bureau of Prisons for a period of

15   135 months on Count 1 and 120 months on Count 7, to run

16   concurrently with each other for an aggregate of 135 months

17   total.

18              The Court did not -- in addition, this sentence

19   shall run consecutive to any sentence imposed in connection

20   with F -- Case Number F2015148, which is assault, family

21   violence, impede breath circulation, and F2015149, injury to a

22   child, both cases pending in the 282nd Judicial District Court

23   of Dallas County, Texas, as those cases are not related to the

24   pending [sic] offense.

25              The Court does not order a fine because the

1   Defendant does not have the financial resources or future

2   earning capacity to pay a fine.

3               In addition to the mandatory restitution,

4   pursuant to the Mandatory Victims Restitution Act of the 1996

5   as to Count 1, the Defendant is ordered to pay restitution in

6   the amount of $17,284,649.79 payable to the U.S. District

7   Court -- I'm sorry -- U.S. District Clerk, 1100 Commerce

8   Street, Room 1452, Dallas, Texas 75242.  Restitution shall be

9   payable immediately, and any unpaid balance shall be payable

10  during incarceration.

11              Restitution shall be disbursed to Bank of

12  America, N.A., in the amount of $247,400.67.

13              All of these separate disbursements shall

14  reference Dinesh Sah, S-a-h, 2020 PPP loan restitution.

15              The next one is BSD Capital, LLC, d/b/a

16  Lendistry in the amount of $1,509,406.  Celtic Bank, $937,400.

17  Cross River Bank, $12,597,407.12.  That's 12,597,407.12.  And

18  then Kabbage, K-a-b-b-a-g-e, Inc., $1,992,966.  Again, each of

19  those will reference Dinesh Sah, 2020 PPP loan restitution.

20              If upon commencement of the term of supervised

21  release any part of the restitution remains unpaid, Defendant

22  shall make payments on such unpaid balance in monthly

23  installments of not less than ten percent of the Defendant's

24  gross monthly income or at a rate of not less than $50 per

25  month, whichever is greater.  Payment shall begin no later than

1  60 days after the Defendant's release from confinement and

2  shall continue each month thereafter until the balance is paid

3  in full.  In addition, at least 50 percent of the receipts

4  received from gifts, tax return, inheritances, bonuses, lawsuit

5  awards, and any other receipt of money shall be paid toward the

6  unpaid balance within 15 days of receipt.  This payment plan

7  shall not affect the ability of the United States to

8  immediately collect payment in full through garnishment, the

9  Treasury Offset Program, the Inmate Financial Responsibility

10  Program, the Federal Debt Collection Procedures Act of 1990,

11  and any other means available under federal or state law.

12  Furthermore, it is ordered that interest on the unpaid balance

13  is waived pursuant to 18, U.S.C., Section 3612(f)(3).

14              The Court orders the final forfeiture of the

15  properties listed in the Preliminary Order of Forfeiture issued

16  by the Court today, July 28, 2021.

17              Is that right, Counsel?  Government?

18         MS. HILLIARD:  Yes, Your Honor.

19         THE COURT:  Okay.  It is ordered that upon release from

20  imprisonment, the Defendant shall be placed on supervised

21  release for a term of three years on each count, one and seven,

22  to run concurrently with each other.  The Court adopts the term

23  of supervision set forth in Miscellaneous Order Number 64 and

24  outlined in Part G of the Presentence Report, except as

25  modified or supplemented by any facts set forth in any addendum

1    and any facts found by the Court during this sentencing

2    hearing.  Defendant shall comply with these conditions during

3    the term of supervision.

4              It is further ordered that Defendant shall pay

5    a special assessment in the amount of $100 per count for a

6    total mandatory special assessment of $200.

7              In determining the sentence, the Court

8    considered the advisory guidelines as well as the other

9    statutory directives listed in 18, U.S.C., Section 3553(a).  A

10   sentence of 135 months on Count 1 and 120 months on Count 7 to

11   run concurrently with each other is sufficient but not greater

12   than necessary to comply with the purposes set forth in

13   Paragraph 2 of Section 3553(a) -- reflect the seriousness of

14   and provide just punishment for the offense, promote respect

15   for the law, afford adequate deterrence to criminal conduct,

16   and protect the public from further crimes of the Defendant.

17             The sentence is within the guideline range, and

18   that range exceeds 24 months.  And the Court selected the top

19   end of the guideline range because of the extreme conduct and

20   the role in the offense and nature and circumstance of these

21   offenses that the Court mentioned earlier.  The Court did also

22   take into account the Defendant's age as well as his remorse

23   today and also to avoid unwarranted sentencing disparities

24   among defendants.  Those are some of the reasons that I chose

25   the high end as opposed to departing upward or going lower.

1          With respect to the Defendant's age, he just

2     should know better.  It's extreme conduct during a tough period

3     of time.  And so this -- the Court finds that the sentence is

4     sufficient to meet the sentencing guidelines' objectives to

5     punish, deterrence, and protection of the public.

6          I have now stated the sentence and the reasons

7     therefor and with a little more detail than many sentencings

8     that I've had, so I know the lawyers listened up very

9     carefully.  Are there any objections or reason why the sentence

10    should not be imposed as stated?  On behalf of the Government?

11         MS. KAMINKSA:  No, Your Honor.

12         THE COURT:  On behalf of the Defendant?

13         MR. PROSPERE:  No, Your Honor.

14         THE COURT:  The sentence shall be imposed as stated.

15         And for the record, even if the guideline range

16    was not calculated or applied correctly, the Court states that

17    it would have imposed the same sentence for the same reasons

18    given during this sentencing hearing regardless of the

19    applicable guideline range.

20         With respect to dismissal of remaining counts,

21    does the Government have a motion?

22         MS. KAMINKSA:  Yes, Your Honor.  At this time the

23    Government would move to dismiss Counts 2 through 6 of the

24    Indictment.

25         THE COURT:  That motion is granted.

1              Mr. Sah, you have waived your right to appeal

2      your sentence and to complain of it in a collateral proceeding;

3      however, you reserve from that waiver the right to complain of

4      any errors and arithmetic that the Court may have made in the

5      calculation of your total offense level or your criminal

6      history category, the right to challenge the voluntariness of

7      your plea of guilty and/or your waiver of appellate rights, and

8      the right to complain of any ineffective assistance of counsel.

9              Sir, if you decide to appeal on any ground, you

10     do have the right to apply for leave to appeal in forma

11     pauperis if you are unable to pay the cost of an appeal.  And

12     if you decide to appeal, you must do so within 14 days in

13     writing and file it with the Court, and your attorney will

14     assist you in that if you ask him to.

15             Mr. Prospere, is there a BOP preference?

16     MR. PROSPERE:  Your Honor, he's asked if the Court

17     would make a recommendation to BOP in Seagoville.

18     THE COURT:  Okay.  The Court will make the nonbinding

19     recommendation to Seagoville or as close to the Dallas-Fort

20     Worth area as possible.  Is that --

21     MR. PROSPERE:  Yes, ma'am.

22     THE COURT:  The Court will do that.

23             Is there anything further from the Government?

24     MS. KAMINKSA:  No, Your Honor.

25     THE COURT:  On behalf of the Defendant, anything

1    further?

2            MR. PROSPERE:  No, Your Honor.

3            THE COURT:  Probation, did you follow me?  Anything

4    that I missed or...

5            PROBATION OFFICER:  No, Your Honor.

6            THE COURT:  Thank you.

7                    And at this time the Defendant is remanded to

8    the custody of the United States Marshals, and the court is

9    adjourned.  Thank you, everybody.

10           SECURITY OFFICER:  All rise.

11           (WHEREUPON, the proceedings were adjourned.)

12                          * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

           I, Thu Bui, CRR, RMR, Official Court Reporter,
United States District Court, Northern District of Texas, do
hereby certify that the foregoing is a true and correct
transcript, to the best of my ability and understanding, from
the record of the proceedings in the above-entitled and
numbered matter.


                                  /s/ Thu Bui
                              Official Court Reporter